IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


AMY MICHELE GENEVIE,           )
                                         )
                   Plaintiff,      )
                                         )
v.                                     )     CIVIL ACTION NO. 05-1733
                                       )
                                       )
ALPHONSO JACKSON,          )
SECRETARY OF HOUSING     )
AND URBAN DEVELOPMENT,   )
                                       )
                   Defendant.   )


## <u>MEMORANDUM OPINION</u>

CONTI, District Judge.

In this memorandum opinion, the court considers the motion for summary judgment (Docket No. 19) filed by defendant Alphonso Jackson, Secretary of Housing and Urban Development ("defendant" or the "Agency"), against all claims asserted by plaintiff Amy Michele Genevie ("Genevie" or "plaintiff") under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") and the Equal Pay Act of 1963, as amended, 29 U.S.C. § 206(d) ("Equal Pay Act"). After considering the joint statement of material facts ("joint statement" or "J.S."), and the other submissions of the parties, and based upon the undisputed facts of record, viewing all disputed facts in favor of plaintiff and drawing all reasonable inferences in favor of plaintiff, defendant's motion for summary judgment will be granted.

## I. Factual and Procedural Background

### A. Plaintiff's Employment with OIG

Genevie, a female, was hired by the Office of Inspector General ("OIG") of the Department of Housing and Urban Development ("HUD") in July 1998 as a GS-7 level auditor in the Financial Audits Division in Washington, D.C. (J.S., ¶1.) In July 1999 plaintiff was promoted to GS-9 and in July 2000 she was promoted to GS-11. (Id. ¶2.) In October 2000 plaintiff transferred to the Pittsburgh, Pennsylvania office. (Id. ¶3.) Plaintiff's second level supervisor, the Regional Inspector General for Audit ("RIGA"), during the time period relevant to this case was Daniel Temme ("Temme"). (Id. ¶4.) Plaintiff's immediate supervisor, the Assistant Regional Inspector General for Audit ("ARIGA"), during the time period relevant to this case was Christine Begola ("Begola"). (Id. ¶5.)

In July 2001 plaintiff became eligible for promotion to GS-12, but was not promoted. (Id. ¶7.) The decision not to promote plaintiff to GS-12 in July 2001 was made by Temme, Begola's supervisor. (Id. ¶8.) On July 24, 2001, plaintiff sent an email to Temme stating she noticed that she was not promoted. (Id. ¶9.) In July 2002, Genevie again was not recommended for promotion to GS-12. (Id.¶60.) In August 2002, Begola had a mid-year evaluation review with plaintiff. (Id. ¶61.) Begola informed plaintiff that she would not be promoted to GS-12 because of perceived issues with timeliness and communication with superiors. (Id. ¶62.) Plaintiff's annual performance evaluation for the time period February 2001 to January 2002 stated:

> [The plaintiff] needs to work on completing her assignments in a
> timely fashion and providing a more accurate status of the work in

> progress to her supervisors. . . . [T]he work is not timely, which in part, helped delay the overall issuance of the draft report.

(Id. ¶63.)

Begola discussed meeting established deadlines with plaintiff throughout the year preceding her potential promotion date. (Id. ¶64.) Plaintiff's End of Assignment Evaluation in April 2002 stated, "she did not prepare her work papers on a timely basis. . . . This had an effect on the date of the issuance of the PHAS audit report." (Id. ¶65.)

The Agency's stated reasons for not promoting plaintiff were her inability to perform at her existing level and her failure to demonstrate that she had the ability to perform at a higher level. (Id. ¶93.) Since 2000, plaintiff has been told that her work is untimely and her audit findings need supporting documentation. (Id. ¶94.) In 2000, plaintiff's End of Assignment Evaluation provided by Debra Braun ("Braun"), the auditor in charge ("AIC") on one of the audits to which plaintiff was assigned, stated the following:

> Communication as to the actual steps completed and additional work not finished needs to be accurate and clear. I believe the problems with finishing this section of the FS audit occurred to a large degree because thirteen steps were being reported as completed back on November 17, 2000, when one through seven had not been executed.

> Time management is an area needing close attention on assignments. When beginning a W/p [work paper] set a goal for a time of completion. It is important to stay on task and focused.

(Id. ¶96.) Plaintiff disagrees with the statements in Braun's End of Assignment Evaluation because Braun herself had problems with performance related to the areas of written communication and technical skills and time resources. (Id. ¶97.)

For the appraisal period from October 2000 to January 2001, plaintiff's review noted that, "Amy and her AIC [Braun] miscommunicated on the status of the job completion and therefore the assignment did not progress according to established timeframes [sic]." (Id. ¶98.) Plaintiff's performance appraisal for the period between February 2001 and January 2002 stated that, "Ms. Genevie needs to work on completing her assignments in a timely fashion and providing a more accurate status of the work in progress to her supervisors." (Id. ¶99.) Plaintiff's End of Assignment Evaluation for the period February 2001 to January 2002 stated:

> An area Amy needs to improve on is the timely preparation of her work and providing a more accurate status on the completion of work to her supervisors. During the OHAS audit, she did not prepare her work papers on a timely basis . . . . This had an effect on the date and issuance of the PHAS audit report.

(Id. ¶100) (inconsistency in original).

From January 2001 through May 2002 plaintiff alleges that she was doing the job of Chandra Dey ("Dey"), a male, during the "HUD's Utilization of the Public Housing Assessment System" ("PHAS") audit, a national audit. (Id. ¶15.) Plaintiff alleges that Dey possessed neither the knowledge nor the experience to carry out his responsibilities and therefore she had to assume many of these responsibilities, while being paid at the GS-11 level. (Id. ¶16.) When asked about plaintiff's allegations that she performed Dey's responsibilities during the PHAS audit, Temme explained that plaintiff was assigned duties during the PHAS audit that comported with her grade level. (Id. ¶17.)

Dey came to HUD as a GS-12 auditor, and applied for and was selected for his current GS-13 senior auditor position. (Id. ¶18.) Dey was a GS-13 senior auditor during the period from January 2001 through May 2002. (Id. ¶19.) Plaintiff was a GS-11 auditor during that same

period.  (Id. ¶20.)  Dey was assigned to the PHAS audit because he had previously conducted a

nationwide audit as the AIC.  (Id. ¶21.)  Dey was designated the AIC on the PHAS audit because

he was the most senior auditor on the audit, and was therefore considered to be the most capable

of handling a nationwide review.  (Id. ¶22.)

Plaintiff asserts that she wrote the audit program, conducted portions of the audit alone,

supported most of the audit findings, and wrote significant portions of the audit report.  (Id. ¶23.)

Temme stated that according to the work papers documenting the audit, the audit program was

largely created by the original AIC, Allen Leftwich, who was Dey's predecessor.  (Id. ¶24.)

Temme and Begola stated that auditors at the GS-11 grade level are required to document their

own findings.  (Id. ¶25.)  Based upon the position description for a GS-13 auditor, Dey's

responsibilities as AIC in the PHAS audit included reviewing the findings of staff auditors and

assimilating them into a final report.  (Id. ¶26.)  The PHAS audit was completed more than six

months after its target date.  (Id. ¶27.)

Plaintiff was promoted to GS-12 in October 2002.  (Id. ¶69.)  Temme said that he decided

to promote plaintiff because she had made some improvement over the year, it appeared that the

audit she was working on was on track, and he felt it would motivate her to perform at a higher

level.  (Id. ¶70.)

On September 16, 2003, Begola spoke with plaintiff as part of plaintiff's mid-year review.

(Id. ¶101.)  Plaintiff was informed in writing in December 2003 that she would not be promoted to

GS-13.  (Id. ¶102.)  In the December 2003 memorandum, Temme stated that plaintiff was not

going to be promoted because her work over the past year had not demonstrated that she had the

ability to perform at the GS-13 level.  (Id. ¶103.)  Temme also stated in the December 2003

memorandum that plaintiff's work continued to be untimely and the documentation required to support her work was deficient.  (Id. ¶104.)

In an End of Assignment Evaluation for the time period February 2004 through December 2004, Begola, plaintiff's supervisor, noted that, "Ms. Genevie needs to work in the area of time management to ensure assigned segment [sic] are completed within the established timeframe [sic]."  (Id. ¶105.)  Begola gave plaintiff a memorandum, dated December 3, 2004, discussing plaintiff's performance.  (Id. ¶106.)  The December 3, 2004 memorandum communicated Begola's concerns regarding plaintiff's performance, especially plaintiff's continual failure to meet deadlines.  (Id. ¶107.)  The December 3, 2004 memorandum to plaintiff stated in part:

> A successful GS-12 Auditor must demonstrate the ability to timely execute an audit, be cognizant of milestone dates and complete assigned work within the established timeframe [sic].  However, you continually fail to meet deadlines for various assignments.  Throughout the current review of the Baltimore Housing Authority, the AIC continually provided you with deadlines . . . .  Throughout the audit, established deadlines were continually missed, even after you provided input as to the specific date the work would be completed . . . .  Good management of time and resources is at the core of every successful auditor, and you must improve your performance in these areas.

(Id. ¶108.)

The memorandum gave specific examples of situations where important deadlines were missed, and urged plaintiff to improve her performance in the area of time management and resource management.  (Id. ¶109.)  The memorandum suggested six steps that Begola believed were ways that plaintiff could improve her performance, including, among others, such things as forecasting work to be performed in a given week, reviewing work completed at the end of each

week to insure tasks have been accomplished, and eliminating non-work related distractions. (Id. ¶110.) The memorandum further warned that if the deficiencies in plaintiff's performance were not corrected, Begola would have to initiate more formal corrective action in the form of an Opportunity to Improve period, which if not successfully completed could result in plaintiff's demotion or removal. (Id. ¶111.) For the rating period February 2004 to January 2005, Begola again noted that, "Ms. Genevie needs to remain cognizant of properly referencing her work papers," and "[t]ime management is a continual challenge for Ms. Genevie and has been discussed with her on several occasions." (Id. ¶112.) Since the year 2000, the Agency consistently documented plaintiff's performance problems. (Id. ¶114.)

Plaintiff disagrees with the statements concerning untimely work and supporting documentation for audit findings contained in her evaluations and performance appraisals. (Id. ¶95.) Plaintiff contends that the perceived deficiencies in her work performance resulted from being assigned more work and being held to a higher standard for documenting work than the rest of the staff. (Pl.'s Resp. to Def.'s Statement of Material Facts ¶58.)

B. Temme and Begola – Record of Promotions

Both Temme and Begola have a record of promoting employees under their supervision. (J.S. ¶71.) Temme selected Begola, a female, to be an Assistant Regional Inspector General for Audit, a GS-14 position. (Id. ¶72.) Temme stated that as of December 2003, he had been in his position of Regional Inspector General for Audit for about four years. (Id. ¶76.) Temme has denied a male auditor, John Morris ("Morris"), promotion to the GS-12 level several times. (Id. ¶77.) Temme stated that Morris had been denied promotion to the GS-12 level for more than ten years. (Id. ¶78.) Temme denied Morris a promotion to GS-12 for several years, both before

7

plaintiff was denied her promotion and after she was given her promotion. (Id. ¶79.) At the time of Temme's departure from the Agency, he was denying career-ladder promotions to three individuals, two females (one being the plaintiff) and one male. (Id. ¶80. ) Kimberly Harrison, a female auditor under Begola's supervision, was promoted from GS-9 to GS-11 in February 2003, and then to GS-12 in April 2004. (Id. ¶81.) Begola also promoted another female, Debra Braun, to GS-12 in March 2003. (Id. ¶82.) Begola did not recommend the promotion of any male to GS-13 during her tenure as the Assistant Regional Inspector General for Audit. (Id. ¶83.)

    C.  <u>Career Ladder Progression for Auditors</u>

The career ladder progression for auditors, like plaintiff, in the OIG is from a GS-7 auditor (entry-level) to a GS-13 senior auditor. (Id. ¶28.) The responsibilities at each grade become progressively more demanding and accountable. (Id. ¶29.) Both Begola and Temme reference the written standards for the GS-11, GS-12, and GS-13 auditor positions in evaluating the performance of auditors on their staff. (Id. ¶30.) Auditors are expected to demonstrate the elements contained in the standards for their position. (Id. ¶31.) The distinctions between the grade levels are mainly related to knowledge, skill and responsibility. (Id. ¶¶32-44.) Generally, a GS-13 auditor is expected to be able to lead and manage an audit with minimal supervision, while a GS-12 requires more supervision, and a GS-11 auditor requires even more supervision. (Id. ¶47.) When asked about the expectations for a GS-13 auditor, Temme stated:

> We expect more from them. They're supposed to control the audit. They're supposed to divvy out things, keep the ARIGA posted. They're the front person.

(Id. ¶50.)

Under 5 C.F.R. Part 300, Subpart F § 300.604(a), "Time-in-Grade Restrictions," an Office of Personnel Management regulation governing the promotion of Federal employees, an employee must spend one year at the lower grade level in order to become eligible for a promotion to the next grade level. (Id. ¶51.)

D. Discrimination Claim

On August 22, 2002, plaintiff initiated contact with an EEO counselor. (Id. ¶10.) As the basis for her EEO complaint, plaintiff stated: "On August 9, 2002, I learned that my promotion was being denied again. I felt that I have been treated different [sic] than male staff as it relates to the career ladder promotion procedures." (Id. ¶11.) On the EEO complaint form, plaintiff stated that she sought corrective action in the form of "Retroactive promotion to GS-12 as of eligibility date, 7/01/01." Id. ¶12. Plaintiff filed a formal complaint with the EEO on October 17, 2002, alleging discrimination on the basis of sex and violation of the Equal Pay Act. (Compl. ¶8; Pl.'s Ex. U.) Although plaintiff was a GS-11 in July 2002, plaintiff sought a retroactive promotion as of July 2002 to the GS-13 level, because if she had been promoted to the GS-12 level in July 2001, when she was first eligible, she would have been eligible for promotion to the GS-13 level in 2002. (J.S.¶68.)

E. Retaliation Claims

In August 2002 plaintiff initiated contact with an EEO counselor. (Id. ¶10.) In October 2002, two months after she contacted the counselor and the same month she filed her EEO complaint, Temme promoted plaintiff to GS-12 because she appeared to be progressing well and he hoped the promotion would motivate her to continue to improve. (Id. ¶117.) On December 3, 2004, plaintiff's supervisor issued a memorandum to plaintiff, noting deficiencies in plaintiff's

performance and urging plaintiff to improve her performance.  (Id. ¶118.)  The December 3, 2004

memorandum gave specific examples of situations where important deadlines were missed, and

urged plaintiff to improve her performance in the areas of time management and resource

management.  (Id. ¶119.)  While the memorandum brought performance deficiencies to plaintiff's

attention, and offered a method by which she could improve, it had no impact on plaintiff's

compensation or any other terms, conditions or privileges of employment.  (Id. ¶120.)  Temme

testified:  "our whole goal is to try to get staff fully trained and operational, competence [sic] so

they can be our front line 13s.  And the quicker I do that, the easier it is for me to do my job . . .

and our production is going to be up."  (Id. ¶121.)  In February 2004 plaintiff amended her EEOC

complaint to claim retaliation and discrimination for the December 3, 2004 memorandum

regarding her performance.  (Id. ¶122.)

     In March 2005, plaintiff received both her Annual Performance Appraisal for the 2004

year and an End of Assignment Evaluation for a project that she worked on in 2004.  (Id. ¶124.)

Both the Annual Performance Appraisal and the End of Assignment Evaluation gave plaintiff a

passing rating, but the evaluations also stated that plaintiff had difficulties producing work

products that were timely and properly documented.  (Id. ¶125.)  While the comments in the

Annual Performance Appraisal state that plaintiff has trouble with time management, since 2000

the Agency has consistently documented plaintiff's difficulties in completing work assignments in

a timely manner.  (Id. ¶129.)  In plaintiff's March 2005 End of Assignment Evaluation, plaintiff

received a "pass" rating in all elements.  (Id. ¶130.)  The comments on this rating, however, also

noted plaintiff's difficulties in producing a timely, well-documented work product.  (Id. ¶131.)

On March 25, 2005, plaintiff amended her administrative complaint to allege retaliation for the Annual Performance Appraisal and End of Assignment Evaluation.  (Id. ¶126.)

## II.  Procedural History

On July 26, 2005, an administrative law judge conducted a hearing concerning plaintiff's claims.  (Id. ¶84.)  In a decision issued on August 18, 2005, the administrative judge found that plaintiff failed to establish a prima facie case of sex discrimination under Title VII, (id. ¶92), and that plaintiff failed to establish a prima facie case of sex discrimination under the Equal Pay Act.  (Compl. ¶14.)  With respect to plaintiff's retaliation claims, the administrative judge found that plaintiff failed to establish a prima facie case.  (J.S. ¶134.)  On September 14, 2005, the Agency accepted the administrative judge's decision.  (Compl. ¶16.)  On September 19, 2005, plaintiff received the Agency's notice of acceptance of the administrative judge's decision.  (Id. ¶17.)  Having exhausted her administrative remedies, plaintiff timely filed her complaint in the instant action.  Plaintiff's complaint reiterates her claims of discrimination on the basis of sex, violation of the Equal Pay Act, and retaliation claims, which were included in February 2004 as amendments to her EEOC complaint.  Defendant moved for summary judgment and plaintiff opposed the motion.[1]

_____

[1]After defendant filed a reply to plaintiff's response, plaintiff filed a document entitled: Plaintiff's Response to the Defendant's Additional Evidence Provided in Response to the Plaintiff's Response to the Agency's Motion for Summary Judgment (Docket No. 36), along with a slew of exhibits, asserting that defendant's evidence was false and misleading.  Plaintiff, however, did not obtain leave of court to file this document.  The court denied the motion and instructed plaintiff that for the court to consider the issues she raised, i.e., that the defendant presented false and misleading evidence, she would need to file a motion to strike and reminded plaintiff that, despite the fact that she is *pro se*, she is subject to Rule 11 of the Federal Rules of Civil Procedure.  As of the date of this opinion, plaintiff has not filed a motion to strike or a

## III. <u>Standard of Review</u>

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. <u>Id.</u> at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. <u>El v. Southeastern Pa. Transp. Auth.</u>, 479 F.3d 232, 238 (3d Cir.2007)("In considering the evidence, the court should draw all reasonable inferences against the moving party.").

The Supreme Court held in <u>Celotex Corp v. Catrett</u>, 477 U.S. 317 (1986), that:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and <u>Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings</u> and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

motion for reconsideration. Consequently, "Plaintiff's Response to the Defendant's Additional Evidence Provided in Response to the Plaintiff's Response to the Agency's Motion for Summary Judgment" will not be considered for purposes of this decision.

<u>Id.</u> at 324 (emphasis added).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative,  summary judgment may be granted."  <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

**IV.  <u>Discussion</u>**

In defendant's pending motion for summary judgment, four issues are presented for disposition: A) whether plaintiff's original contact with an EEO counselor regarding her sex discrimination claim for the Agency's failure to promote her to GS-12 level auditor in July 2001 was timely made pursuant to 29 C.F.R. § 1614.105(a)(1); B) whether plaintiff established a prima facie case under the Equal Pay Act; C) whether plaintiff met her burden of adducing sufficient evidence of record for a reasonable jury to find that the proffered reason for the Agency's failure to promote her to GS-13 level auditor in August, 2002 was pretext; and D) whether plaintiff established a prima facie case of retaliation under Title VII.  The court will address each issue in turn.

**A.      Timeliness of Plaintiff's  Sex Discrimination Claim for the Agency's Failure to Promote Her to GS-12 Level Auditor in July 2001**

A threshold question before the court is the timeliness of plaintiff's initial contact with an EEO counselor.  29 C.F.R. § 1614.105(a)(1) requires:

> An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory, or, in the case of a personnel action, <u>within 45 days</u> of the effective date of the action.

29 C.F.R. § 1614.105(a)(1) (emphasis added).  On July 24, 2001, plaintiff became aware of the act alleged to be discriminatory, her non-promotion to GS-12 level auditor.  Plaintiff's initial contact with an EEO counselor was more than one year later – August 22, 2002.

Plaintiff, who is acting pro se, asserts that her claim is timely under one or both of the twin doctrines of continuing violation or equitable tolling, although plaintiff's memorandum does not couch her position in those exact terms.  The gist of plaintiff's argument is that although she was aware that she was not promoted to GS-12 auditor on July 24, 2001, defendant's denial to promote her continued until October 6, 2002, when the plaintiff was promoted to GS-12.  Plaintiff also argues  that, although she was aware that she was not promoted to GS-12 auditor on July 24, 2001, she did not know the reasons why until August 2002, and appears to rely on equitable tolling principles.

    1.   <u>Continuing Violation</u>

The continuing violation doctrine is an equitable remedy that is applicable when a defendant's conduct is part of a continuing practice. <u>Cowell v. Palmer Twp.</u>, 263 F.3d 286, 292 (3d Cir.2001).  The application of the doctrine operates to make "an action . . . timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." <u>Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.</u>, 927 F.2d 1283, 1295 (3d Cir. 1991)(citing <u>Keystone Ins. Co. v. Houghton</u>, 863 F.2d 1125, 1129 (3d Cir.1988)).  The continuing violation doctrine does not apply when a plaintiff is aware of the injury at the time it occurs. <u>Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.</u>, 331 F.3d 406, 417 n.6 (3d Cir. 2003).  The Supreme Court has made clear that a failure to promote is a discrete act that

"occurred" on the day that it "happened," and therefore the continuing violation doctrine in a Title VII case is inapplicable to such a claim. <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002) (Title VII case).

While it is true, as plaintiff argues, that defendant continued to deny her a promotion to GS-12 from July 24, 2001 until October 6, 2002, when plaintiff was promoted to GS-12, the discriminatory act giving rise to her claim "occurred" on the day that it first "happened," thereby commencing the 45-day period for her to contact an EEO counselor. To find otherwise would make the 45-day time limit contained in 29 C.F.R. § 1614.105 meaningless. By way of example, under plaintiff's theory of the case, plaintiff's co-worker John Morris, a male auditor, who had been denied promotion to the GS-12 level for more than ten years, would still have a viable claim if discrimination played a part in the decision not to promote him ten years earlier. Even the most liberal reading of the regulation proscribes the result urged by plaintiff.

2.      <u>Knowledge of Reason for Failure to Promote</u>

Plaintiff's other argument – that her claim is timely because, although she knew she was not promoted to GS-12 in July 2001, she did not know the reasons why until August 2002 – must also be rejected. In employment discrimination cases, the United States Court of Appeals for the Third Circuit has recognized that "a claim accrues in a federal cause of action upon awareness of actual injury, not upon awareness that this injury constitutes a legal wrong." <u>Oshiver v. Levin, Fishbein, Sedran & Berman</u>, 38 F.3d 1380, 1386 (3d Cir. 1994); <i>see</i> <u>Good v. Federal Reserve Bank of Cleveland</u>, No. 05-cv-383, 2007 WL 2955615, at *4 (W.D.Pa. Oct. 9, 2007). "Indeed, once the adverse employment act occurs, such as termination or failure to promote, the employee becomes obligated to make further inquiry into the circumstances surrounding the adverse action."

Good, 05-cv-383, 2007 WL 2955615, at *5 (citing Bouker v. CIGNA Corp., No. 94-cv-39, 1994 WL 594273, at *2 (E.D.Pa. Oct. 24, 1994)). Here, plaintiff knew she was not promoted and did not make further inquiry.

3.    Equitable Tolling

Plaintiff also relies on the doctrine of equitable tolling, in substance though not in name, to support the timeliness of her failure to promote claim. As its name suggests, equitable tolling is designed to prevent statutes of limitation from working unfair results. The United States Court of Appeals for the Third Circuit has identified three principal situations in which equitable tolling is particularly appropriate:

> (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action;
> (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or
> (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.

Robinson v. Dalton, 107 F.3d 1018, 1022 (3d Cir. 1997).

There is no evidence that the first or third scenarios are applicable to this claim. Furthermore, there are no facts of record to support a finding by a finder of fact that plaintiff's assertion of her rights was thwarted by any extraordinary means. In order for a plaintiff to be entitled to equitable tolling on an otherwise time-barred claim, a plaintiff must "exercise due diligence in preserving [her] claim." Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990). Equitable tolling is an extraordinary remedy which should be only sparingly extended. Id. Plaintiff failed to produce evidence sufficient to justify the application of equitable tolling to her retroactive promotion to GS-12 claim.

On July 24, 2001, plaintiff knew she was denied her promotion to GS-12. Plaintiff, however, did not initiate contact with an EEO counselor until over a year later, well beyond the 45-day period required by statute. Under those circumstances, plaintiff's sex discrimination claims for failure to promote her to GS-12 auditor in July 2001 is untimely and summary judgment must be granted in favor of defendant on this claim.

**B.      Plaintiff's Equal Pay Act Claim**

Plaintiff asserts a claim under the Equal Pay Act. The basis for this claim is plaintiff's contention that from January 2001 through May 2002 she was performing equal work to Dey, the GS-13 AIC of the PHAS audit. Additionally, plaintiff claims that at some point, she performed work equal to or exceeding that of work of three similarly situated males: Ramiro, Dey, and David Kasperowicz ("Kasperowicz"), an independent verifier on the McKeesport Housing Authority Maintenance Audit who was promoted to ARIGA during the course of that audit.

To establish a prima facie case under the Equal Pay Act, a plaintiff must adduce evidence that employees of the opposite sex were paid differently for performing "equal work." Stanziale v. Jargowsky, 200 F.3d 101, 107 (3d Cir. 2000). "Equal work" is defined as "work of substantially equal skill, effort and responsibility, under similar working conditions." Id. (citing EEOC v. Del. Dep't of Health and Soc. Services, 865 F.2d 1408, 1413-14 (3d Cir. 1989)).

In determining what constitutes "equal work," the courts have looked beyond job titles to distinguish whether the jobs are substantially equal. See Brobst v. Columbus Services International, 761 F.2d 148 (3d Cir. 1985); Shultz v. Wheaton Glass Co., 421 F.2d 259, 265-66 (3d Cir. 1970), cert. denied, 398 U.S. 905 (1970). In Welde v. Tetley, Inc., 864 F.Supp. 440, 442 (M.D.Pa. 1994), the court elaborated on the elements of the "equal work" test, noting:

17

"Skill" includes an assessment of such factors as experience, training, education and ability. 29 C.F.R. §1620.15. "Effort" refers to the physical or mental exertion needed to perform the job. 29 C.F.R. § 1620.16. "Responsibility" concerns the degree of accountability required in performing a job, with emphasis on the importance of the job obligation. 29 C.F.R. § 1620.17. These three terms - skill, effort, responsibility - "constitute separate tests, each of which must be met in order for the equal pay standard to apply." 29 C.F.R. § 1620.14(a).

Id.

Additionally, in <u>Brobst</u>, the court of appeals held:

The crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, i.e. whether a significant portion of the two jobs is identical. The inquiry then turns to whether the differing or additional tasks make the work substantially different.

761 F.2d at 156, (citations omitted). In <u>Brobst</u>, the court also commented:

The interpretive regulation issued by the Department of Labor makes clear that, "In applying the various tests of equality to the requirements for the performance of such jobs, it will generally be necessary to scrutinize the job as a whole and to look at the characteristics of the jobs being compared *over a full work cycle*." 29 C.F.R. § 800.119 (1984).

<u>Id.</u> at 158 (citations omitted)(emphasis in original).

While it is recognized that Dey being a GS-13 and that plaintiff being a GS-11 during the relevant time period are not determinative on the equal pay issue, it is also not a distinction without a difference. To support her claim plaintiff would need to show that Dey and she were performing substantially the same work. Plaintiff's allegations, however, suggest at most that during the relevant time period she performed some of the same functions as Dey, not that the two were performing "substantially the same work over a full work cycle." <u>Brobst</u>, 761 F.2d at 158. Plaintiff also pointed to Ramiro and Kasperowicz as comparators. There, however, is insufficient evidence for a reasonable finder of fact to conclude that plaintiff was performing equal work to

Ramiro or Kasperowicz other than plaintiff's bare assertion. Plaintiff's Equal Pay Act claim rests

solely on conclusory allegations and references to exhibits that appear to be either some kind of

staffing chart or documents that relate to the proper documentation of work papers, but do nothing

to bolster her claim. For these reasons, plaintiff failed to adduce sufficient evidence to establish a

prima facie case. If undisputed facts of record, after resolving all disputed facts in favor of

plaintiff and drawing all reasonable inferences in favor of plaintiff, compel the conclusion that no

reasonable finder of fact could find that plaintiff can establish a prima facie case for her Equal Pay

Act claim, it is not necessary to conduct the further analysis that involves burden-shifting or

affirmative defenses. On the record before the court, no reasonable finder of fact could render a

verdict in her favor on her Equal Pay Act claim. Summary judgment will be granted in favor of

defendant on this claim.


**C.    Plaintiff's Sex Discrimination Claim for the Agency's Failure to Promote Her
        to GS-13 Level Auditor in August 2002**

Plaintiff also asserts a claim of sex discrimination under Title VII based upon the failure of

the Agency to promote her in August 2002.[2]  Title VII makes it unlawful for an employer to

---

[2]In addition to plaintiff's sex discrimination claim for the Agency's failure to promote her to GS-12 auditor on July 24, 2001, which the court found was untimely, plaintiff also asserts a claim of sex discrimination based on the failure to promote her to GS-13 on August 9, 2002, a claim that was timely made. The premise of this claim is that had plaintiff been promoted to GS-12 in July 2001 she would then have been eligible for promotion to GS-13 in August 2002, and the fact that she was not is what gives rise to the claim. Although the court can not accept this logic, for it presupposes that plaintiff would have performed satisfactorily at the GS-12 level for an entire year when, for aught that appears, she was unable to perform at least satisfactorily enough to obtain that position, noting again that plaintiff is before the court pro se, rather than dismiss the claim because of the more technical deficiencies inherent in it, it will be analyzed on its merits.

discriminate against any person with respect to compensation, terms, conditions, or privileges of employment on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). Since 1972 Title VII has required that personnel actions affecting federal employees "shall be made free from any discrimination based on race, color religion, sex or national origin. 42 U.S.C. § 2000(e)-16(a). The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with "conscious intent to discriminate." McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). One manner in which plaintiffs can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination. Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

In McDonnell Douglas, the Supreme Court developed the now familiar burden-shifting framework for courts to utilize as a tool in analyzing disparate treatment claims. The McDonnell Douglas framework requires a plaintiff alleging a violation of Title VII to first establish a prima facie case of discrimination. The prima facie case, the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." Burdine, 450 U.S. at 254; see also Id. at n.6. In so doing, "the prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" Id.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998). The burden on the defendant at this juncture

is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision. . . ." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)(emphasis added)(citations omitted).

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "'the McDonnell Douglas framework - with its presumptions and burdens' - disappear[s], . . . and the sole remaining issue [is] 'discrimination *vel non*,' . . . ." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142-43 (2000)(citations omitted). The plaintiff, thus, has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

To state a claim for discrimination under Title VII, a plaintiff must show by a preponderance of the evidence that: (1) she was a member of the protected class; (2) she was qualified for the position for which she applied; (3) she was subject to adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's qualifications to fill the position. McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 253; Sarullo v. United States Postal Service, 352 F.3d 789, 797 (3d Cir. 2003).

The first three elements of a prima facie case are met here: plaintiff is a member of a protected class (female); she was qualified for the promotion (as that element is taken to mean that she was eligible for the promotion); and she was not promoted.

The fourth element of a prima facie case in issue here is whether there is evidence of record that males were more favorably treated than plaintiff. More specifically, whether males with qualifications similar to plaintiff were promoted to GS-13 while she was not. The United States Court of Appeals for the Third Circuit in <u>Scheidemantle v. Slippery Rock Univ. State System of Higher Education</u>, 470 F.3d 535 (3d Cir. 2006), set forth two guiding principles with respect to considering when to determine whether a prima facie case under Title VII has been established. <u>Id.</u> at 538. First, Title VII is a remedial statute, so it must be interpreted broadly in order to effectuate its purpose. <u>Id.</u> at 538-39. Second, there is a low bar for establishing a prima facie case of employment discrimination. <u>Id.</u> at 539.

> In Title VII cases involving a dispute over "subjective" qualifications, we have recognized that the qualification issue should often be resolved in the second and third stages of the *McDonnell Douglas* . . . analysis, to avoid putting too onerous a burden on the plaintiff in establishing a prima facie case . . . . Because the prima facie case is easily made out, it is rarely the focus of the ultimate disagreement.

<u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 523 (3d Cir. 1993)(internal citations omitted)(quoted in <u>Scheidemantle</u>, 470 F.3d at 539). In consideration of the broad statutory interpretation and the low bar for the Title VII prima facie case contemplated by the United States Court of Appeals for the Third Circuit, the court will assume for purposes of summary judgment that plaintiff has met her initial burden of establishing a prima facie case of employment discrimination. Under the <u>McDonnel Douglas</u> framework, the court must now consider whether defendant proffered a legitimate, nondiscriminatory reason for not promoting plaintiff.

Defendant offered two reasons for not promoting plaintiff: plaintiff's inability to perform at her existing level and not demonstrating that she had the ability to perform at a higher level.

The record before the court is replete with documentation evidencing plaintiff's performance problems relating to the timeliness of her work and the improper documentation of her work papers. Def.'s Exs. C, D, F, G, K, L, M, P. Therefore, the court is satisfied that defendant set forth a legitimate, non-discriminatory reasons for not promoting plaintiff and met its burden of production.

Plaintiff now must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'. . ." Id. at 765 (citing Ezold, 983 F.2d at 531;emphasis in Fuentes). Furthermore, plaintiff needs to show more than that the employer's decision was "wrong or mistaken," but that the decision was actually motivated by discriminatory animus. Id.

Plaintiff argues she should have been promoted, but her evidence consists of pointing to other arguably equally undeserving employees, male (i.e. Dey) and female (i.e. Braun), who were nevertheless promoted, as well as a number of ways in which her supervisors failed to assess adequately her performance. Plaintiff provided no evidence that any of the adverse employment decisions plaintiff suffered were motivated by discriminatory animus towards her based upon her sex. Even read generously, plaintiff's only proof that she has been the victim of employment discrimination based upon her sex appears to be her belief. Reviewing the evidence proffered by

plaintiff, the court must conclude that she failed to present sufficient evidence for a reasonable finder of fact to find that defendant's reasons were not worthy of credence. Just to be perfectly clear, the court is not concerned with whether or not plaintiff deserved to be promoted; rather, the court is only concerned with whether or not the Agency's failure to promote her was because of impermissible and illegal discrimination. A reasonable finder of fact could not render a verdict in her favor on this claim. Therefore, summary judgment is granted in defendant's favor with respect to plaintiff's sex discrimination claim for failure to promote her in August 2002.

D.      **Plaintiff's Retaliation Claim**

Plaintiff asserts a retaliation claim against the Agency alleging that a December 2004 memorandum critical of her performance and her Annual Appraisal and an End of Assignment Evaluation in March 2005, both of which contained critical comments, were issued in retaliation for plaintiff having filed her discrimination complaint in October 2002[3].

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in conduct protected by Title VII; (2) after or contemporaneous with engaging in that conduct, her employer took an adverse action against her; (3) the adverse action was "materially adverse;" and (4) there was a causal connection between her participation in the protected activity and the adverse employment action. LeBoon v. Lancaster Jewish Cmty. Center Ass'n, 503 F.3d 217, 231-32 (3d Cir. 2007)(citing Moore v. City of Philadelphia, 461 F.3d 331,

---

[3]In plaintiff's affidavit plaintiff states that she believed her "current assignment"and an incident when she was required to travel to Baltimore, Maryland to document her work papers from the Allegheny Housing Authority's Drug Elimination Grant audit were also instances of retaliation. Pl.'s Ex. A at 9-10. Because plaintiff has adduced no evidence of record to support her contention that these incidents were adverse, they will not be considered as part of her retaliation claim for purposes of this opinion.

341-42 (3d Cir. 2006)); *see* <u>Burlington Northern & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006). In <u>Burlington Northern</u> the Supreme Court held that under the anti-retaliation provision of Title VII employer actions are materially adverse if the actions are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Id.</u> at 2409.

Plaintiff's opposition to summary judgment on this claim consists, *in toto*, of identifying the elements of a prima facie case, more or less as the court has done above, and simply stating that all of the elements are met. Plaintiff points to the first three elements and argues that management's knowledge of her protected activity resulted in negative comments on her performance evaluations and the "continuous" failure to promote her. she also argues without pointing to any evidence, that she can prove a direct link between the protected activity and the adverse employment actions. Simply arguing that there is a direct link, however, does not make it so. "Although courts are to resolve any doubts as to the existence of genuine issues of fact against the parties moving for summary judgment, Rule 56(e) does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Fireman's Ins. Co. of Newark, N.J. v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir. 1982).

The first step in embarking on a Title VII retaliation claim analysis is determining whether or not plaintiff has established a prima facie case.

The Agency concedes that plaintiff satisfied the first element of a prima facie case, that she engaged in conduct protected by Title VII. The second element of the prima facie case, whether or not plaintiff was subjected to an adverse employment action, and the third element, whether or not the adverse action was "materially adverse" as disputed by the parties. Defendant's argument

is predicated on three district court cases, <u>Holliday v. Comcast Cable Communications, LLC</u>, No. 05-cv-2554, 2007 WL 551514 (E.D.Pa. Feb. 16, 2007)(plaintiff placed on performance improvement plan, but successfully completed it), <u>Sykes v. Pa. State Police</u>, No. 05-cv-1349, 2007 WL 141064 (W.D.Pa. Jan. 17, 2007)(plaintiff's actions belied the argument that the employer's actions would deter reasonable person from engaging in protected activity), and <u>Meyer v. Nicholson</u>, 441 F.Supp.2d 735 (W.D.Pa. 2006) (memorandum in issue never placed in the plaintiff's personnel file and a report authored by a fellow employee had not been received by the decision maker), all of which were decided after the new standard announced in <u>Burlington Northern</u>, and recognize that not all employer conduct believed by an employee to be adverse constitute an adverse employment action. Negative performance evaluations and written reprimands, however, may constitute adverse employment actions. *See* <u>Hempfling v. United Refining Co. of Pa.</u>, No. 06-cv-335, 2008 WL 201900 (W.D.Pa. Jan. 23, 2008) ("write-ups" was adverse employment action under identical standard of the Age Discrimination in Employment Act), <u>EEOC v. Novartis Pharmaceuticals Corp.</u>, No. 05-cv-404, 2007 WL 2905892 (W.D.Pa. Sept. 28, 2007) ("conduct memorandum" and "Territory Coaching Plan" considered adverse employment action), <u>Cooper v. City of Philadelphia</u>, No. 06-cv-576, 2007 WL 1825399 (E.D.Pa. June 21, 2007) ("negative performance evaluation" considered adverse employment action). Whether the writings in issue are so critical of plaintiff's performance that they were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination," <u>Burlington Northern</u>, 126 S.Ct. at 2409, is a close question and the court will assume, *arguendo*, and without deciding, that plaintiff could establish that the December 2004

memorandum and the March 2005 Annual Performance Appraisal and End of Assignment

Evaluation satisfied the materially adverse employer conduct elements of the prima facie case.

The dispute with respect to plaintiff's retaliation claim, thus, turns on whether plaintiff can

demonstrate a causal nexus between her protected activity and the adverse action taken by

defendant. With respect to the existence of a causal link between the employee's protected

activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2)

evidence of ongoing antagonism. Abramson v. Wm. Patterson College of N.J., 260 F.3d 265, 288

(3d Cir. 2001) ("Temporal proximity . . . is sufficient to establish the causal link. [A] plaintiff can

[also] establish a link between his or her protected behavior and subsequent discharge if the

employer engaged in a pattern of antagonism in the intervening period.").

The United States Court of Appeals for the Third Circuit has been somewhat ambivalent

with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie

case. *See* Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997) ("Temporal proximity

is sufficient to establish the causal link."); Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989)

(causal link established where plaintiff discharged two days following employer's receipt of the

plaintiff's EEOC claim); *but c.f.* Quiroga v. Hasbro, Inc., 934 F.2d 497 (3d Cir. 1991) (affirming

lower court's determination that the timing of the plaintiff's discharge alone did not raise an

inference of retaliation); Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)

(causation prong not established on timing alone where nineteen months passed following

protected activity and adverse employment action: "Even if timing alone could ever be sufficient

to establish a causal link, we believe that the timing of the alleged retaliatory action must be

'unusually suggestive' of retaliatory motive before a causal link will be inferred."). Timing,

however, in connection with other types of suggestive evidence, is sufficient to demonstrate the causal link. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000). For example, the court of appeals held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the prima facie case. Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986); Abramson, 260 F.3d at 289 ("Here, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); *see also* EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir. 1997), cert. denied, 522 U.S. 1147 (1998).

In this case the alleged retaliatory adverse action occurred more than two years after the protected activity engaged in by plaintiff, i.e., contacting an EEO counselor on August 22, 2002 and filing an EEO complaint in October 2002 asserting discrimination based on sex for the Agency's failure to promote her. Generally, as is the case here, an intervening period of more than two years between the protected activity and the allegedly adverse act will not be "unusually suggestive" of retaliatory animus. *See*, e.g., Krouse v. American Sterilizer Co., 126 F.3d 494 (3d Cir. 1997)(intervening period of 19 months). In order to establish the requisite causal nexus, plaintiff must, therefore, adduce probative evidence of ongoing antagonism or implausibilities in defendant's reasons for not promoting her. "[W]e have indicated that the passage of a long period of time between protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is no evidence of retaliatory animus during the intervening period." Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000)(citing Krouse, 126 F.3d at 503-04 ("Absent evidence

of intervening antagonism or retaliatory animus, we conclude that the passage of time [between the filing of plaintiff's charge and the alleged retaliatory action] in this case is conclusive and that [plaintiff] failed to establish a causal link as a matter of law."); Woodson, 109 F.3d at 920-21).

Plaintiff, has produced no evidence of intervening antagonism or retaliatory animus, or any other evidence that establishes a causal connection between the protected activity and the adverse acts. What is exceptionally noteworthy in this case is that plaintiff was promoted in the period between her protected activity and the alleged retaliatory actions. Likewise, plaintiff has offered no evidence to support a finding that defendant's reasons for the adverse employment actions were vague or inconsistent. "Revealing discrepancies in the proffered reasons can also constitute evidence of the causal link." Abramson, 260 F.3d at 289. The record in this case, however, is rife with evidence documenting defendant's consistent position that plaintiff's work performance was unsatisfactory with respect to timeliness and documentation of work product, both before and after plaintiff engaged in protected activity. Based upon the evidence of record, viewing disputed facts in favor of plaintiff, and drawing all reasonable inferences in plaintiff's favor, the court concludes that a reasonable finder of fact could not conclude that a causal link exists between plaintiff's protected activities and the adverse actions. Summary judgment will be granted in favor of defendant with respect to plaintiff's claims for retaliation.

In the interest of completing the analysis, the court notes that even if plaintiff had been able to establish a prima facie case, summary judgment on this claim would still be appropriate because plaintiff did not address the Agency's legitimate, non-discriminatory reasons for the adverse employment actions, nor produce any evidence or even argue that these reasons were pretext and that discrimination, more likely than not, was the real reason for the critical comments

contained in the memorandum and evaluations. *See*, e.g., <u>Shaner</u>, 204 F.3d at 501; <u>Sheridan v. E.I. Dupont de Nemours & Co.</u>, 100 F.3d 1061, 1067 (3d Cir. 1996)(*en banc*).

## V.  <u>Conclusion</u>

For the foregoing reasons, defendant's motion for summary judgment is granted, and the case is dismissed with prejudice.  The clerk shall mark this case closed.

An appropriate order shall issue.

By the court:

<u>/s/ JOY FLOWERS CONTI</u>
Joy Flowers Conti
United States District Judge

Dated: March 24, 2008

cc: Parties of Record